[Crim. No. 3985. Second Dist., Div. Three. Sept. 18, 1946.]

THE PEOPLE, Respondent, v. JAMES J. HICKS, Appellant.

Gladys Towles Root for Appellant.

Robert W. Kenny, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

SHINN, J.—Appellant was charged with two offenses of violation of section 288 of the Penal Code, one against a 10-year-old girl, Marilyn, and the other against a 10-year-old girl, Rebecca. In a trial before the court he was acquitted upon the first count and convicted upon the second. The arguments presented in his behalf upon the appeal from the judgment are (1) insufficiency of the evidence; (2) error in receipt in evidence of the testimony given by Marilyn at the preliminary examination; (3) questioning of the defendant and the admission in evidence of the testimony of a police officer which, it is claimed, tended to show that the child Rebecca had indirectly accused defendant of a third offense against her 8-year-old sister, Ramona.

The evidence was sufficient to support the judgment. Defendant owned a small house in San Pedro which he occu-

pied with another man; the two owned a trailer which stood beside the house, and which was rented to and occupied by two women. Nearby was a pony track frequented by children. A short time before the Sunday when the offenses were alleged to have been committed, the three little girls came to defendant's house with the parents of Rebecca. Defendant on that day gave the children 25 cents with which to buy fruit and they returned to his house with cherries. He took the little girls into his bedroom to show them a small Victrola. On Sunday, June 3, the three girls came to his house, asked him for money and he gave them 50 cents to pay for pony rides. They later returned, asked for more money, and he gave Rebecca a dollar. Later Rebecca returned asked for more money, which, according to one of defendant's witnesses, was given to her and, according to defendant, was refused. Upon several of these occasions Rebecca, without invitation from defendant, sat upon his lap. Marilyn, upon his invitation, also sat upon his lap. During the afternoon and while the children were about the house, defendant had guests, consisting of a man and his wife and baby, and after they left a sailor, and two women. After the latter left, according to the testimony of Marilyn, the three girls were in the bedroom and defendant then gave Rebecca money for a pony ride. The alleged offense against Marilyn, according to her testimony, was committed upon defendant's bed and consisted of defendant's fondling her person under her clothing. Her testimony was substantially corroborated by that of the third child, Ramona, 8 years of age, who testified that at the time of the occurrence she was standing in the room. It was also corroborated by the testimony of Rebecca that she returned to the house, looked through the window and saw defendant on the bed with Marilyn.

Rebecca testified that the offense against her was committed upon defendant's bed in the absence of the other two children. As described by the witness, the act of which defendant was accused appears to have been one of attempted rape. Rebecca testified that the two other children returned while the act was in progress, attempted to open the door, that defendant got up to let them in, gave Rebecca a dollar and told her not to tell anybody what had occurred, and that she left the bedroom and went into the living room where the other two girls were. Ramona testified that she and Marilyn returned to the house while Rebecca was in the bedroom with defendant; that they looked through the window, that she saw

defendant lying on the bed with Rebecca, disarranging her clothes, and that Rebecca was crying; that she, Ramona, started to go home to call her mother, but a boy chased her, and that she returned to the window where Marilyn was; that after she entered the house, defendant gave her 25 cents and told her not to tell, and that he gave Rebecca a dollar. The mother of Rebecca testified that no complaint was made to her by Rebecca on the day of the occurrence but that it was made upon the following day. A more detailed statement of the testimony is unnecessary. The stories told by the children, if believed, were sufficient to prove the commission of the offense charged in count II. Testimony was given by defendant and by his several visitors which, if believed, would have proven the stories of the children to be untrue. Some visitors were there during the entire afternoon and the substance of their testimony was that defendant was not alone with the children at any time. Defendant testified that he left the house immediately after the last of his visitors left. The children testified that the offenses were committed after the callers had left.

In pronouncing defendant guilty upon count II, the court said, in part: "I have searched, ever since this trial has commenced, every way in my own mind for some reasonable theory on which to acquit this defendant, but to me the record is so convincing as to the guilt of the defendant, especially on count II, that the court must find the defendant guilty on count II." This conclusion, reached after a careful weighing of the evidence, finds ample support in the record and may not be disturbed.

The child Marilyn did not appear as a witness at the trial and her testimony at the preliminary examination, when she was not cross-examined, was received in evidence over the objection of defendant. It is now urged that no sufficient foundation was laid by proof that due diligence had been used to procure the attendance of the witness. The trial was set for July 24, 1945. Marilyn and her mother had been subpoenaed on July 2 to attend the trial. The mother of Rebecca and Ramona was called as a witness, testified that she was acquainted with Marilyn and her mother, that they had resided close to her home, that on July 14 they left, saying that they were going to New York, that she had known them for about four months, that they visited each other, and she gave the following testimony: "Q. Did you see them pack up to leave? A. Yes. Well, they tell us they had gone to the City

Hall in San Pedro to tell them about it. They tell them they are leaving and they had O.K.'d this for them. I went out there myself to find out about this and they told me it was O.K., the father had been there with them, over at the City Hall at the Juvenile office.'' Defendant's objection was then overruled and the testimony of Marilyn was read. Aside from her description of defendant's mistreatment of her, there was nothing in her testimony which was in substantial conflict with that given by the defendant. She did not testify to any act of misconduct of defendant with Rebecca. Before the case of the People was closed, the court allowed counsel for the defense to question Rebecca's mother further with respect to her testimony as to the departure of Marilyn's family, and she testified on cross-examination as follows: ''Q. Did you ask them whether they were getting gasoline from the ration board to go back to New York? A. Well, I didn't have to ask that. They told me and I saw the stamps they got. They got over 200 stamps, I mean over 200 gallons; that is what they got. I seen that myself.'' A police officer of the juvenile division who had investigated the case testified for the People that Marilyn's father had come to him about the 9th of July, informed him that he had to take his family to New York, and asked if there was not some way to advance the case so that it could be tried before they left. He was told that he should see the district attorney about the matter, but it does not appear whether he did so. This witness did not report the incident to the district attorney, and the People apparently relied upon the subpoenas which had been served to insure the presence of Marilyn and her mother. For aught that appears, the departure of the witnesses was discovered by the district attorney at the time of trial. No lack of diligence up to that time was shown. When the mother and daughter failed to appear at the trial, the facts as to their movements were disclosed and testified to by Rebecca's mother and the police officer. Their testimony constituted substantial evidence that the missing witnesses had left the jurisdiction some 10 days before the date of trial. It was sufficient to make it appear highly probable that a search for them within the jurisdiction would have been unavailing. It was not an abuse of discretion for the court to hold that due diligence had been used to produce the girl Marilyn at the trial and to permit her testimony to be read. Such rulings may be questioned only for abuse of discretion. (*People* v. *Bernstein,* 70 Cal.App.2d 462, 468 [161 P.2d 381], and cases therein cited.)

During the cross-examination of defendant, he was asked whether he had not stated to Officer Smith that Rebecca said to him that if he did not give her money she would tell what he had done to her. He denied having made the statement. He was then asked if he had told Mr. Smith that Rebecca had said to him, "If you don't give me some money, I will tell what you did to my sister," and he replied, "I don't remember saying anything like that." Then he was asked, "I will ask you if you did not further say in that same conversation with Mr. Smith that the 'Major' then spoke up and said, 'Well, if you get into any trouble with this little girl, I will be a character witness for you,' " and defendant answered, "I don't remember saying that to Mr. Smith; no, sir." Officer Smith, in rebuttal, testified that on June 3 defendant told him that one of the little girls came in and, while Major and Mrs. Goldblum were there, said: "If you don't give me some money I'll tell what you did to my sister." He did not testify that Rebecca was the author of this statement. He further testified that defendant had said to him that Major ·Goldblum, following the child's statement, said, "Well, if you get into any trouble with this child or any of these kids I will be a character witness for you." This testimony of the officer was given without objection by defendant. It is now urged that it was error to permit this cross-examination of defendant and to allow the officer to testify to the alleged statements of defendant. The grounds of the objection to the cross-examination were that it was not proper impeachment and was hearsay. The ground now urged is that the questions tended to suggest that defendant may have been guilty of some act of mistreatment of Rebecca's sister Ramona. The objection is without merit. The questions appear to have been asked in good faith upon cross-examination, even though some of them named Rebecca as the author of the alleged statement, while the testimony of Officer Smith did not. If there was a suggestion of additional wrongdoing in the questions asked upon cross-examination with respect to Rebecca's alleged statement, and which laid a foundation for impeachment, it could not have operated prejudicially to defendant in view of the fact that Ramona testified that defendant had never touched her or been guilty of any act of misconduct toward her. Furthermore, Major Goldblum, also referred to as Mr. Goldblum, was a witness for defendant and testified that no such incident as the one allegedly related by defendant

to Officer Smith had occurred. Also, defendant had testified fully as to his conversations with the children when he gave them money, and the statements to Officer Smith, if made, would have been contradictory of his testimony in a material respect. Impeachment being proper, it is entirely immaterial that it may suggest the possible commission of offenses other than those for which defendant is on trial. (*People* v. *Tomlinson*, 102 Cal. 19, 24 [36 P. 506]; *People* v. *York*, 134 Cal.App. 507, 509 [25 P.2d 514]; *People* v. *Romer*, 218 Cal. 449 [23 P.2d 749].)

For the reasons stated, the judgment is affirmed.

Desmond, P. J., and Wood, J., concurred.